UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 24-20494-CR-ALTMAN (SCOLA)

UNITED STATES OF AMERICA,

vs.

DAVID WAYNE CURRIN, JR.,

    Defendant.
_____/

**SENTENCING MEMORANDUM & MOTION FOR DOWNWARD VARIANCE**

    David Currin Jr., through undersigned counsel, respectfully files this sentencing memorandum and motion for downward variance to aid in the Court's determination of an appropriate sentence. Probation and the Government state that Mr. Currin's guideline range is life. (*See* DE 34 & 36). The maximum sentence he can receive under the law is 600 months. (DE 34 ¶ 79). As discussed in Mr. Currin's Objections to the draft Presentence Investigation Report ("PSI"), Mr. Currin argues that his guideline range is 324 to 405 months. (*See* DE 35). As explained below, Mr. Currin contends that a sentence of **300 months** is appropriate in this case and fully satisfies the 18 U.S.C. § 3553 factors.

    **A. Mr. Currin's history and characteristics**

    There are several reasons why this Court should downward vary in this case and sentence Mr. Currin to 300 months. For starters, Mr. Currin has had a challenging childhood. Growing up gay in conservative North Florida and Alabama came with significant bullying and ridicule in school. As reflected in the Forensic

1

Psychological Evaluation and Report by Dr. Marelene Orozco ("Forensic Report")—filed separately under seal—Mr. Currin was "terrorize[d]" by other children at school, who would call him derogatory terms. *Id.* at 3. Mr. Currin's difficulties finding community in the South are not a surprise considering research showing how "people in the South show[] more discomfort with LGBT people than those in the U.S. overall." *See LGBT Life in the South*, GLAAD.[1] Although Mr. Currin's mother remained supportive of Mr. Currin's sexuality, he struggled in school to fit in and make friends.

Mr. Currin's struggle to fit in was exacerbated by his frequent uprooting, which fostered a sense of instability. Mr. Currin was raised by a single mother who had to move to her family to different states to find and maintain employment. (*See* Forensic Report at 12). Research shows that "[c]hildren experiencing residential instability demonstrate worse academic and social outcomes than their residentially-stable peers, such as lower vocabulary skills, problem behaviors, grade retention, increased high school drop-out rates, and lower adult educational attainment." *See* Heather Sandstrom & Sandra Huerta, *The Negative Effects of Instability on Child Development: A Research Synthesis*, URBAN INST., at 6 (Sept. 2013).[2] Although some stress is normal for healthy development, "children exposed to strong, frequent, and/or prolonged adversity, or *toxic stress*, are at risk for cognitive impairment and stress-related disease." *Id.* at 13 (emphasis in original).

---

[1] Available at: https://glaad.org/life/.

Mr. Currin's frequent moves growing up likely caused a degree of toxic stress in his life that may have negatively impacted his development.

The hostile realities of Mr. Currin's every-day life led him to the internet where he was exposed to mature content at a young age. Notably, recent research has shown that experiencing extrafamilial emotional abuse[3] is "significantly associated" with (1) higher scores of internet and computer gaming addiction, and (2) the likelihood of problematic use of the internet. *See* Kornelius Winds, et al., *Adverse childhood experiences and problematic use of the internet among a child and adolescent psychiatric clinical population*, 139 COMPREHENSIVE PSYCHIATRY, at 1 (2025).[4] This research examined how "[i]nternet use, and especially its problematic nature, may reflect a possible attempt to cope with unpleasant feelings by escaping into an online world." *Id.* Growing up, when Mr. Currin came home from school, his mother was usually working, and his sisters were occupied with their own activities. Meaning, Mr. Currin's family was not able to compensate for his ostracization in school. As a result, at an early age, Mr. Currin was on the internet with little to no supervision.

To make matters worse, Mr. Currin did not have a paternal figure in his life.

---

[2] Available at: https://www.urban.org/sites/default/files/publication/32706/412899-The-Negative-Effects-of-Instability-on-Child-Development-A-Research-Synthesis.PDF.

[3] "Extrafamilial emotional abuse can be interpreted as an aversively perceived social receptive space, which is ultimately attempted to be compensated for by the creation of an online receptive space." *Id.* at 4.

[4] Available at: https://www.sciencedirect.com/science/article/pii/S0010440X25000136/pdfft?md5=4dec592d1d6ca248445b6e5f8b8bd6d6&pid=1-s2.0-S0010440X25000136-main.pdf

His parents had separated before he was born. His father was in-and-out of his life, sporadically showing up at the family home and frequently having interactions with the criminal justice system. When Mr. Currin's father was present, he was often inebriated. Simply put, Mr. Currin's father was not a source of support or love in his life. In sum, Mr. Currin's challenging life experiences warrant a downward variance in this case.

### A. The need to avoid unwarranted sentencing disparities

A sentence of 300 months' imprisonment is consistent with other similarly situated defendants charged in this District. This Court should consider the below-cited comparator cases when fashioning an appropriate sentence in this case in order to avoid unwarranted sentencing disparities:

- *United States v. Codey Allen Bates*, Case No. 23-cr-80123-RLR (S.D. Fla.). The Court sentenced Mr. Bates to **324 months** after he pleaded guilty to one count of production of child pornography. (DE 28). Mr. Bates admitted to producing a video where he was masturbating with his less-than-two-year old biological son. (DE 29 at 1–2). Mr. Bates's infant son is **non-verbal autistic**. (*Id.* at 2). Mr. Bates "removed [victim's] diaper, exposing [victim's] genitals to the camera as the focus of the video . . . ." (*Id.*). "The adult male then placed his penis between the bars of the crib and placed [victim's] hand on [defendant's] (the adult male's) penis multiple times." (*Id.* at 2). The factual proffer describes the multiple times throughout the video where the defendant placed his infant son's hand on his penis.

- *United States v. Ruby Nelson Escudero*, Case No. 21-cr-20367-KMM (S.D. Fla.). The Court sentenced Mr. Escudero to **262 months** after pleading guilty to one count of production of child pornography, one count of distribution of child pornography, one count of transportation of child pornography, and one count of possession of child pornography. (DE 62). During a post-*Miranda* interview, Mr. Escudero molested his twelve-year-old daughter on multiple occasions, forcing her to manually masturbate the defendant and perform oral sex on him. (*Id.*; DE 54 at 7). Mr. Escudero produced images of the molestation. (DE

4

54 at 7). He also had several videos and images of child-sexual abuse material on his phone. (*Id.* at 6).

- *United States v. Terry Johnson*, Case No. 23-cr-60026-RS (S.D. Fla.). The Court sentenced Mr. Johnson to ***250 months after a jury*** found him guilty of one count of production of child pornography and one count of enticement of a minor to engage in criminal sexual activity. (DE 43 & 57). The offending conduct included Mr. Johnson having sexual intercourse with his fourteen-year-old stepdaughter and filmed the conduct on his cellphone. (DE 77 at 19–22; DE 75 at 93–94). Mr. Johnson had raised his stepdaughter since she was two-and-a-half years old. (*Id.*).

- *United States v. Miles Steven McGough*, Case No. 23-cr-60061-KMM (S.D. Fla.). The Court sentenced Mr. McGough to ***235 months*** after pleading guilty to one count of enticement of a minor to engage in criminal sexual activity. (DE 54). The Government dismissed the remaining counts—including the production of child pornography—at the sentencing hearing. (*See* DE 33 at 1). Mr. McGough admitted to conversing with the 15-year-old minor victim via Snapchat. (DE 34 at 1). Mr. McGough traveled from Colorado to visit the minor victim in Florida. (*Id.* at 5). A search of Mr. McGough's phone revealed videos and images of, amongst other things, the minor victim performing oral sex on Mr. McGough and stroking his penis. (*Id.* at 5).

- *United States v. Olinto Lynch*, Case No. 21-cr-80174-RLR (S.D. Fla.). The Court sentenced Mr. Lynch to ***240 months*** after pleading guilty to one count of production of child pornography. (DE 26 & 51). As described by the Government, Mr. Lynch used the social networking application Snapchat to solicit at least three (3) young teenaged girls: one rebuked him; another (Minor Victim 1 or MV1) responded to Lynch's desires and produced child pornography at his discretion; and, a third (Minor Victim 2 or MV2) Lynch met in person and attempted to have her to produce child pornography as well." (DE 49 at 1). MV1 was 13 years-old, and MV2 was 14 years-old. (*Id.* at 1).

- *United States v. Thomas Patrick Keelan*, Case No. 12-cr-20496-JEM (S.D. Fla.). The Court sentenced Mr. Keelan to ***200 months after a jury*** found him guilty of two counts of enticement of a minor to engage in sexual activity. (DE 93 & 114). As described by the then-Assistant United States Attorney (now The Honorable U.S. District Judge) Roy K. Altman, "a 52-year-old English teacher, the defendant meticulously induced and enticed JS–his depressed and socially marginalized 15-year-old student–into a sexual relationship." (DE 106 at 1). "Further,

5

>[a]s that relationship progressed, the defendant became the first person to engage in oral, anal, and sadomasochistic sex with JS–who was at the time so confused about his identity that he had taken to cutting himself with sharp objects." (*Id.*). "All told, the defendant had anal and oral sex with JS between 50-60 times–all while JS' family thought JS was either at school, with a friend, or at tennis practice." (*Id.*). "During sex, the defendant routinely bound JS with ropes and ties; whipped JS; slapped JS; and penetrated JS with a whole host of sexual objects, include 'dildos,' 'vibrators,' and 'butt plugs.'" (*Id.*).

This Court should consider the above-listed comparator cases when deciding what an appropriate sentence is in this case.

**B. The nature and circumstances of the offense, need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, to provide just punishment, and to protect the public**

Without question, the offense conduct in this case must be admonished. Indeed, Mr. Currin must receive a sentence of at least fifteen years under the law. *See* 18 U.S.C. § 2251(e). The question remaining is—how much imprisonment is necessary and appropriate? Here, twenty-five years for a first-time offender is more than enough to fully punish Mr. Currin for his conduct and to protect the public.

Notably, Mr. Currin will face numerous collateral consequences resulting from this case. For example, he will be a registered sex offender for the rest of his life. In addition, he will likely encounter difficulties finding a place to live given the residential limitations for sex offenders in Florida. Upon release, Mr. Currin anticipates returning to Jacksonville, where his mother resides. But Duval County, which contains Jacksonville, is the county in Florida with the highest rate of registered sex offenders with a transient address. *See Sex Offender Registration and Monitoring Triennial Review – 2018,* Report No. 18-08, OFFICE OF PROGRAM

POLICY ANALYSIS AND GOV. ACCOUNTABILITY, at 23 (Dec. 2018).[5] In other words, Mr. Currin will continue to be punished for the offense conduct even after he completes his carceral sentence and period of supervised release. When deciding the term of imprisonment to impose in this case, this Court should consider how these collateral consequences will automatically increase the severity of Mr. Currin's sentence.

With respect to the need to protect the public, Mr. Currin has the ability and desire for change such that this Court can be assured that Mr. Currin will be rehabilitated upon his release and not reoffend. Specifically, while in prison, Mr. Currin will have access to treatment. And, perhaps more importantly, Mr. Currin is willing to participate and receive treatment for his maladaptive behavior.

Mr. Currin's desire to participate in treatment is an important consideration because research has shown that sex offender treatment has a statistically-significant impact on recidivism. Specifically, a study "evaluate[d] the effectiveness of prison-based treatment by examining recidivism outcomes among 2,040 sex offenders released from Minnesota prisons between 1990 and 2003 (average follow-up period of 9.3 years)." Grant Duwe & Robin Goldman, *The Impact of Prison-Based Treatment on Sex Offender Recidivism*, 21 SEXUAL ABUSE: A JOURNAL OF RESEARCH AND TREATMENT 279, 279 (2009). Results from the study "revealed that participating in treatment significantly reduced the hazard ratio for rearrest by 27% for sexual recidivism." *Id.* "That is, sex offenders who participated in treatment recidivated less often and more slowly than untreated offenders; as a

---

[5]Available at: https://oppaga.fl.gov/Documents/Reports/18-08.pdf.

result, treated sex offenders survived longer in the community without committing a new sex offense[.]" *Id.* at 296. Although dropping out of treatment, either by quitting or being terminated, "did not have a significant effect on sexual recidivism," "[c]ompleting treatment, however, did significantly decrease the risk (hazard) relative to not receiving treatment, reducing it by 33% in the risk score model and 34% in the individual predictor model." *Id.* at 296. As relevant here, because Mr. Currin will participate in sex offender treatment while in prison, he will present a lower risk of reoffending when he is eventually released.

Consistent with this research, Dr. Orozco found that Mr. Currin's "prognosis is good" and he "presents with several psychological strengths that **support the likelihood of a favorable treatment response.**" (*Id.* at 13 (emphasis added)). In particular, Mr. Currin "appears to recognize the need for help, expresses a willingness to engage in therapy, and demonstrates a positive attitude toward personal change." (Forensic Report at 13). Dr. Orozco noted that Mr. Currin "responses suggest an acknowledgement of important problems and a recognition of the need for help in addressing them." (*Id.* at 10). Simply put, Mr. Currin has the necessary perspective and attitude to successfully complete sex offender treatment.

Moreover, during his evaluation with Dr. Orozco, Mr. Currin "expressed feelings of guilt, remorse, and responsibility for his actions, stating, 'Besides feeling bad for the boy (referring to the victim), I lost my sister." *Id.* at 6; *see also id.* at 8 ("He exhibited crying behavior and expressed feelings of remorse, particularly in relation to the victim in his legal case."). Mr. Currin's remorse for his actions and

acceptance of responsibility for the crimes are important factors because "[f]or clinicians and professionals working with sexual offenders, it comes as no surprise that many offenders deny their offences." *See* Howard E. Barbaree, *Denial and Minimization among Sex Offenders: Assessment and Treatment Outcome*, at 30 (1991).[6]  In fact, "[d]enial is generally regarded as a main impediment to successful therapy."  *Id*.  To that end, researchers suggest that "targeting denial and minimization should be the first stage of treatment, to increase motivation for treatment and set the stage for further assessment and treatment."  *Id*. at 33. Here, Mr. Currin's acceptance of responsibility for the full scope of his conduct and remorse for the harm he caused buttresses Dr. Orozco's good prognosis for him.

In addition, this Court should consider Mr. Currin's age when he will be released from prison.  Mr. Currin will be 31 years old in a few days. (DE 34 at 3).  If this Court imposes a 300-month sentence, Mr. Currin—factoring in "good time" credit—with be over 52 years old when he is released from prison.  In 2017, the U.S. Sentencing Commission examined the effects of aging on recidivism among federal offenders and found that "[o]lder offenders were substantially less likely than younger offenders to recidivate following release."  *See The Effects of Aging on Recidivism Among Federal Offenders*, U.S. SENTENCING COMM'N, at 9 (2017).[7] Specifically, the Commission's 2017 Report made the following findings, as relevant here:

---

[6] Available at: https://www.publicsafety.gc.ca/lbrr/archives/forum%203-4-1991%20e-eng.pdf.

9

- White offenders who were between ages 50 to 59 at release had a 9.9% rate of reincarceration. *Id.* at 44.

- Offenders whose primary offense type was not drug trafficking, firearms, fraud, or robbery, and were between ages 50 and 59 at release, had a 9.2% rate of reincarceration. *Id.* at 47.

- Offenders whose base offense level ranged from 32 to 43 and were between ages 50 and 59 at release had a 10.3% rate of reincarceration. *Id.* at 48.

- Offenders who had a Criminal History Category I and were between ages 50 and 59 at release had a 5.5% rate of reincarceration. *Id.* at 50.

- Offenders who received a sentence of 120 months or more and were between ages 50 and 59 at release had a 15.7% rate of reincarceration. *Id.* at 52.

As the Commission's 2017 Report demonstrates, recidivism rates for offenders like Mr. Currin, who will be released from prison at a more mature age, are less likely to recidivate and therefore present a decreased danger to the community.

### C. Deterrence

Until this case, Mr. Currin had never served a period of incarceration. Accordingly, a significantly sentence of 300 months will certainly deter Mr. Currin from reoffending. Further, such a significant sentence will, in effect, result in Mr. Currin spending the rest of his youth behind bars. In addition to his loss of liberty, Mr. Currin's separation from his family and friends for such an extended period of time is an added deterrent. But for this case, he has been known by those in his community as someone who is responsible, respectful, and hard-working. He is someone who has "always sought to uplift those around him," (DE 37-6), "always

---

7 Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-

been a shoulder to lean on and someone [] to count on to help," (DE 37-4), and "puts others first and is always the first one there to give a helping hand, or just listen," (DE 37-8). His mother calls him "her rock." (DE 37-1). As demonstrated by the letters filed in support of Mr. Currin's sentencing, Mr. Currin is deeply loved by his mother and his friends.

At bottom, Mr. Currin's abusive conduct in this case is not reflective of who he is or wants to be. He knows he has hurt several people with his exploitative behavior, and he feels deeply remorseful for his conduct. In fact, everyday Mr. Currin regrets the harm he has caused the victim and his family. He also regrets the damage he has done to his own family. At the same time, Mr. Currin is determined to change and ensure that his offending behavior was an aberration in his character, not a trait. Mr. Currin accepted responsibility for his conduct quickly after his arrest and intends to address the Court at sentencing in further detail regarding his remorse for his conduct.

### D. Conclusion

For the foregoing reasons, Mr. Currin contends that a sentence of 300 months' imprisonment fully satisfies the § 3553(a) factors and is the appropriate sentence in this case.

---

publications/research-publications/2017/20171207_Recidivism-Age.pdf.

                      **Respectfully submitted,**

                      **HECTOR A. DOPICO**
                      **FEDERAL PUBLIC DEFENDER**

By:    */s/Alexandra Hoffman*
          Alexandra Hoffman
          Assistant Federal Public Defender
          Florida Bar No. 1011796
          150 W. Flagler Street, Suite 1700
          Miami, Florida  33130
          Tel:   305-530-7000
          E-Mail Address: alexandra_hoffman@fd.org

**CERTIFICATE OF SERVICE**

I HEREBY certify that on April 9, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

                      */s/Alexandra Hoffman*
                      Alexandra Hoffman